The next case for argument is 18-1109, BMW of North America versus United States. The next case for argument is 18-1109, BMW of North America versus United States.  I'm here today on behalf of plaintiff appellant BMW of North America, LLC. We've raised two issues on appeal before this court, the rate issue and the revocation issue. On the rate issue, if the only fact that matters in this case is that BMW failed to respond to a quantity and value questionnaire, and that permits commerce to impose any rate, then this court should affirm the Court of International Trade's decision and the Commerce's decision on remand. However, it is BMW's position that commerce was required by law to consider the specific record of this case. Just to clarify what you mean by that, because your conduct, even though there's no dispute, an AFA rate was justified, right? That's correct. So it's a question of where we are on a range. You suggest there's a range between more benign misconduct or negligence, and then something much worse. So are you suggesting that there's a sliding scale based on the problems of how bad the conduct was, and therefore that's what ought to be applied? And then on review, can we also apply the sliding scale to evaluate it? Your Honor, yes. What our position is, is that the courts are required to consider, and commerce was required to consider, what degree of deterrence was warranted based on the record of this case. And that's what commerce failed to do. So it needs to consider what the deterrence factor in a case needs to be. And it's not permissible under the law to treat a respondent who acted in bad faith, who was fraudulent, who... This wasn't the extreme. This wasn't the ultimate highest, right? No, this was inadvertent omission. So in this case, this was not a case of providing false information. It was not a case of BMW engaging in gamesmanship. It was BMW inadvertently missing one deadline for quantity and value questionnaire. Can I ask you a question? Which version of 1677E are you relying on? As I understand it, that statute has been modified, effective in 2015, to require what you're asking for, which is where there's going to be the highest rate or margin. I guess it says you have to do an evaluation by the administrating authority of the situation that resulted in the administering authority using an adverse inference and selecting among the facts otherwise available. I think that's really what you're relying on here, but I'm not sure if this is the version of the statute that applies in this case. So we believe that the TPEA, the Trade Preferences Extension Act, which modified, which enacted the new legislation, we believe that that does not apply to this case. In the remand results, the department stated that it considered the remand results to be a new determination, and therefore the standards created under the TPEA should apply. And those standards, those legislative changes concerning commercial, basically the TPEA put into place provisions saying that commercial reality did not need to be considered when considering what rate to apply. And it said that commerce is no longer required to consider what the rate for a cooperating respondent would have been as a result of the TPEA. We believe that the previous version of the statute applies in this case. And we believe this court's decision in Ad Hoc Shrimp speaks to this issue. In Ad Hoc Shrimp, this court decided that you can't apply the TPEA retroactively. And the trade court found in Fresh Garlic that that decision applies also to decisions on remand. Because on remand, you're looking at a decision that occurred prior to the TPEA. I'm afraid you're not understanding my question. Oh, sorry. I think I'm trying to say that I think the version of 1677E, maybe you're, I'm not sure if you're addressing 1677E or not, but I think the version that became effective in June 29, 2015 is actually beneficial to you. And I want to know if you think it applies or not. So I think either prior to the pre-TPEA or post-TPEA, both versions of the statute, I think BMW would prevail. Because under the TPEA... I just want to know which one applies. I'm sorry. The prior version applies. As a matter of law, the prior version applies. However, we do think if this court decides... I think regardless... Yeah, because there is language even in the current version of the TPEA that says that commerce was considered based on an evaluation by the administering authority of the situation that resulted in using adverse facts available. But that's only in circumstances where they end up with the absolute highest rate. That's based on any rate that's selected under the statute. However, even under the pre-TPEA version, the legislative history and the case law of this court says that commerce must select the most probative rate, weighing all of the record facts and finding what rate is required to deter future noncompliance. And that's where we think that this case, where it really comes down to. Can I ask you something? We were talking about deterring future noncompliance. Is that by the particular party? Would that be future noncompliance by BMW? Or would it be future noncompliance by everybody who might be similarly situated? It should be future noncompliance to BMW. Because if BMW was being held as an example to every other party, that is prima facie punitive. How is that not punitive to hold BMW... The purpose of the anti-dumping duty law is to be remedial, not punitive. That's been long established by this court's precedence. So if BMW is being held as an example for other parties, then that's punitive. Is that the key language that you're relying on in our case law is the idea that it shouldn't be punitive? And also the fact that there's also language in the legislative history of the AFA provisions that commerce is required to consider all evidence on record, weighing the record to determine that which is most probative of the issue under consideration. That's not expressly in the statute. You're taking that out of the legislative history, correct? That is part of it, yes. But part of the statutory scheme is it has to be, very basically, the decision has to be based on substantial evidence on that record. And we believe that that's where this decision fails. We asked the court to consider the following facts. The rate applied here of 126.44%, which was calculated on remand, is 88 times higher than the rate applied against every other respondent in this segment of the proceeding. The department itself recognized in the preliminary results of this case that all calculated rates in prior segments under the history of this order, not involving the use of zeroing, were zero. In fact, BMW itself received a 0% rate in the German ball bearings rate review case for the similar review period. And it was the same team at the Department of Commerce working on all of these cases that demonstrated that BMW was not engaged in gamesmanship that required some kind of deterrent rate. Well, what do we do with the fact that commerce did, after remand, cut the rate in half? I mean, it doesn't appear that they didn't consider it at all. They still felt that there was some need for deterrence, right? They did cut the rate in half, but they still did not support their decision with substantial evidence on the record and what they were required to by the legislative history in the case law. But commerce said that the rate they chose represented a transaction-specific dumping margin corresponding to actual transactions during the relevant time period. Why isn't that enough? So what commerce did is it picked a number. It picked a number. It recited several facts in trying to support that number. However, why that model? Why that transaction? Why that range? Why did it settle on that number? And commerce doesn't provide an explanation for that. And more importantly, what it doesn't provide an explanation is why did BMW require a deterrence rate that was more than double the rate it would have received had it simply not requested its own administrative review? BMW, this is not a case such as others that have appeared before this court. So is it review then? I'm sorry? It can't be that when adverse facts are inferred that the party that didn't respond gets to have a rate that's lower than the rate it would have had had it not asked for review, right? Well, no, not lower than. But I think commerce is required to consider, based on the party's actions, what rate was warranted. In cases, for example, before this court where a party has already received an AFA rate before the department and then in a subsequent review, it still does not provide information and it still does not participate and it still warrants adverse facts available. Your view is that it should be somewhere above 54.27, but below 126. No, our position is actually that BMW didn't deserve a rate any higher than 54%. But if that's true, then your theory is we can ask for a separate evaluation. We can choose not to cooperate. And then whatever everybody else gets who does cooperate, that's what we should get. No, I'm sorry. 54% was not the rate that was what everybody who cooperated got. Everybody else got 1.43%. But the parties who didn't request administrative review, I thought that they got 54.27%. Am I wrong? Yes, exactly. So for parties who did not request administrative review, they got 54.27%. So why should BMW get 54.27%? They asked for a review but then didn't cooperate. Well, but it's not that they didn't cooperate. I understand. A mistake was made. Right. I understand. But nonetheless, they asked for a review. Why would they get something? Why would they get 54.27%? They did request review. But in this case, the inadvertent omission, if the issue is what deterrence is required, wasn't it enough deterrence to just simply not give BMW the benefit of the review it had requested? BMW had nothing. And this is also language in the SAAA. The SAAA says that one of the things that commerce is required to consider in the legislative history is that commerce should consider the extent to which a non-cooperative party benefited from its lack of cooperation. That's in the statement. In fact, it will consider the extent to which a party may benefit from its own lack of cooperation. That's exact language from the SAAA. Here, BMW had nothing to gain from not cooperating. It was an inadvertent omission. They wanted the administrative review. They had gotten a 0% in the parallel German proceeding. There was a gap of two and a half years that occurred between the initiation of this case and when it got reinstated. And as a result of that gap, they missed a deadline. And they weren't engaging in gamesmanship. And so if you look on the record of this case, it's our position that anything higher than 1.43% but no higher than 54% would have been deterred enough. And that's especially the case here because the order, in fact, right shortly, just a few months after reinstatement, the order in this case was actually revoked as a result of a subsequent sunset review. So the order was revoked. So what is the deterrence factor here? There were going to be no further review periods in this case where BMW would have then participated again. So what was the future deterrence that they were trying to prevent here for BMW by imposing a rate that was double what it would have gotten had it simply not requested its own administrative review? You're interviewed by the one on the other side. Thank you. May I just wrap up? Well, you'll get rebuttal. If you want to say something, I'll use your rebuttal. There's just one other issue that we brought on appeal, which is the revocation issue, and we'll address this more on rebuttal. But we believe that the statute imposes a requirement that a review may only be conducted if a request for such a review has been received. And we are appealing the department's unlawful reinstatement of the administrative review without following the proper process under the law. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. BMW concedes that an application of an adverse inference was warranted in this case based upon its- So can we just get to what we were talking about with your friend on the other side, which is do you think there's a statutory or some other obligation for, one, the legal standard? Do you have to take into account whether or not this was punitive or whether there was some remedial value to picking a rate? And, two, are you required to articulate the basis for achieving that, the purposes of the review? Certainly, we do not dispute that the purpose of AFA is not to be punitive, but it is to impose or to promote a deterrent effect. And that's not just for the particular respondent or the particular counsel, but it also, of course, serves as an example to other respondents and other counsel that- Right, but shouldn't there be some articulation of why in this particular case, in these particular circumstances, this number serves that effect? No, we don't believe that the statute requires Commerce to do so. Once Commerce has determined, and that it's within its discretion to determine what to apply an adverse inference, its practice, what is statutorily required is for it to pick, in this instance, when it's using primary information, the number certainly has to not be aberrational. So you don't have to worry about corroboration? We do not have to worry about corroboration. What about punitive, whether it's punitive? Well, the problem that we have- How are we supposed to review it? How are we supposed to review whether or not it falls into that punitive category when there's no explanation for it? Well, one way we can do that is to look at what this court has done in the past, which is, of course, if the number is aberrational, if it doesn't bear any, for example- Are you saying aberrational and punitive have the same meaning? No, let me clarify. No, I don't believe that. I think if a number was aberrational, that could indicate a punitive intent, and certainly Commerce should not rely upon aberrational data where there's other data that's available, and that's the problem that Commerce solved here on remand. Right, but how did Commerce address whether it was punitive or not? BMW's primary argument here is it's punitive because it's too high, and it's higher than the cooperative respondents got or the all other rate respondents got. And this court has said in ad hoc shrimp and in other cases that simply because the rate is higher, even higher orders of magnitude- That's not really addressing the question. It's not. I mean, I understand that BMW here is saying something. They think that they should have the same rate that they would have had. They not request review. I'm not sure about that. But what about something in between that amount and 126, and why isn't there some discussion of that in Commerce's opinion? It certainly would have been within Commerce's discretion to pick another rate. At the time, and again, Commerce's practice was, and it's stated practice, it's established practice, was to select either the highest petition rate or the highest transaction-specific rate as the AFA rate. Without considering the reason why the party didn't comply with Commerce's request for information? Yes. And I think actually it is worth pointing out the facts of this case. And even if you accept the premise that BMW is putting forward, that Commerce is required to consider the facts, the facts here are not helpful to BMW. Can I just- I'm really not understanding what this discussion is about. Is it the government's view that it does or does not have to pick a rate that's not punitive? Commerce cannot pick a rate that's punitive. And what is the government's view as to how we review whether or not that is the case? Doesn't there have to be some articulation by Commerce as to why they picked that that indicates to us that it was warranted and not punitive? I think Commerce did so in this particular case. If the court looks at the remand redetermination, although Commerce doesn't use those particular words. Sorry, it's this page. Essentially what Commerce did was look at- It's the final site. Sorry. Well, I'm relying primarily upon pages 1580 and 1581 where Commerce- Right, okay, so it starts at 1575. That's the document. That's the document. Yes, I'm referring to. What Commerce did was to identify the highest transaction- Not even the highest transaction-specific margin, but a transaction-specific margin from a cooperating respondent during the period of review. And it went through some analysis about why it was convinced that that number had- Because that refers to corroboration, but why that number was a reasonable number and why that number- It seems to me, I'm looking at page 1580, and this again is really talking about whether it was aberrational. It has nothing to do with whether it was punitive. Well, it goes on. Are you referring to the rest of it? Because it keeps going on starting the next paragraph. The government is explaining why it picked that number, right or no? Right. But which part do you think addresses whether it was punitive or not? The fact that Commerce went through the analysis to explain why that particular number it was selecting had some basis in reality. And I know that sounds a lot like- So because it's not aberrational, it's not punitive. I mean, because it's- But also specifically because we're talking about a rate of a cooperative respondent during this period of review. This is a real number. It's not a petition rate. It's not a rate from 20 years ago. It's a rate- When she said it had some correspondence to reality, that's kind of a loose standard, isn't it? Well, it- I guess I could say it more strongly. It was an actual transaction-specific calculated- Assuming we accept the proposition that once you get an AFA rate, it's going to be higher than the cooperating respondent. I don't really understand why or see any place where Commerce said why it should be higher than those who didn't seek review. Because Commerce had to look at the facts and set a number for those even without their involvement. And so how could Commerce find a number for those and conclude that that number is different necessarily than the number for BMW? Well, what we're referring to is the- Sorry. Like the difference between 54% and 126%. Right. Well, what we're talking about is, again, a deterrence value to asking Commerce to review the party and then not withdrawing and then not participating and simply not participating in the first place. But the deterrence value, why wouldn't the difference between the cooperating respondents and those who didn't even seek review, why wouldn't that be enough to deter them from going down that road? Well, because then there's no incentive to cooperate. Well, 4% or 1.43 or whatever is pretty big incentive to cooperate, right? Versus 54%. Yes, although, of course, the party, BMW, didn't know that that would be the rate. But what we're talking about are parties for which review was not requested, and so they were never under any obligation to cooperate with Commerce. So the deterrence, in your mind, is not just to deter someone from failing to cooperate, but to deter them from ever even asking for a review. No, no, absolutely not. No, it's from failing to cooperate if they've asked for a review. Right. I mean, once they've asked and Commerce has accepted their request for review, then they are under an obligation to cooperate to the best of their ability, which they concede that they did not do in this circumstance. I flipped ahead a few pages. You might want to look at JA 1590. There's a discussion a little bit here about whether this would be punitive and inconsistent with BMW's level of culpability. Did you want to address that? Thank you, Your Honor. Thank you for pointing that out. So yes, Commerce did address BMW's concern that it would be, their argument about punitive. My only concern here is they mention the argument, but then they just say it appears BMW is seeking to relitigate the department's determination to apply facts available. So I'm not sure what that means, if that means that they think, oh, we're going to apply adverse facts available, it shouldn't be punitive, so therefore we can just rely on something that's not aberrational. I think the parameters of, and I guess to flip to the next page, 1591, how Commerce addressed that question is simply assigning BMW a rate that is higher than it would have obtained. But there's a big difference between 54.27 and 126. Why wasn't that considered? I mean, I understand you can't second-guess Commerce right now. I'm just wondering, are those the only two options that Commerce had? Conceivably, no, those were not the only options. I mean, there was a number of margins that were within, if Commerce, as it did here, to rely upon one of a higher transaction-specific margin. I think the problem is here, what Commerce's determination is being reviewed for is substantial evidence. Is there substantial evidence that this, and what this court said in Nanya Plastics is, if this number is correct, is it a factual matter? If there's no reason to believe that it's aberrational, based on the record, which Commerce... In the case of Nanya and all the other cases that are cited in the briefs, this is where somebody actually didn't respond on purpose or was fraudulent, right? There's, no, I mean... No? Nanya did not involve, I don't believe it involved, I mean, Papir Fabrique... You think that was just mistaken, failure to respond as well? I don't remember exactly what the facts were, but honestly, Your Honor, most of the time it is negligence. It's not the facts of Papir Fabrique when there's actually a fraudulent operation going on. Most of the time, it is a party's failure to act to the best of its ability, which is all the statute requires. I'm really trying to understand how much the government thinks it has to say or not say. Is it your position that just based on what we're reading in 1590 and 1591, that BMW here was arguing in the alternative? It should have been either at least one point, as it did here, 1.3% or 54%. And this, so this response is to why, no, it shouldn't have been those. Those were too low, and that that was BMW's only challenge, so that the Commerce Department didn't have to go the extra step and then talk about why it, the difference between 54 and 126. I think that's fair to say, Your Honor. I also think that this just isn't, you know, Commerce selects a rate. It has a practice, you know, to select, you know, that the parties know that it will generally select the highest transaction-specific rate or a prior rate. So that's a known quantity, and to sort of second-guess whether it should have been 50%. So your view is that that means it's not punitive. I mean, that's what we're struggling with, or how are we to know what your rationale is for the fact that it's not punitive? So you're responding to my question. The question is, I don't know what to do with that, to say that parties generally know that we're going to pick the highest rate, and therefore that's not punitive. That's just the way we do things, the deterrence effect. What are we supposed to do with that analysis? Well, again, I think that the notion that Commerce is not to apply a punitive rate is not a statutory requirement. We acknowledge that, but I think that it's shorthand for Commerce has to pick a number that, you know, is... What is the statutory requirement? The statutory requirement, as it is here, is when it selects from, it may select any rate, so long as it, and when it is, when Commerce is relying upon primary information, that's it. It can select any rate. Well, there's plenty of case law that says it can't be punitive, and not just from us, right? I mean, the fact that it can't be punitive is well-established in the law. Yes. We would respectfully submit that where Commerce identifies a rate that is, as it did here, you know, Commerce confirmed for itself, and the trial court affirmed that it was a number that was not aberrational, and as a trial court found not punitive, that decision should be sustained. Okay.  I'm not entirely sure that the court wants to hear about what essentially was BMW's fallback argument, which was that the process that was followed by the agency was not lawful, that the agency should have, in fact, done over its initiation of the review altogether, and, you know, publish a notice of opportunity to request a review, and sort of re-initiate what it had already done before, but do it again. I mean, she did mention it at the end, but I think, you know, her point is that there's a lot of large corporations out there that have a lot of things to do, and when Commerce tells them this isn't going on anymore, how can they just re-initiate without telling us? Yes, well, I think the answer would be that, you know, we spend a lot of time in our brief talking about the language that was used in the revocation notice. It might seem petty, but Commerce does have terminology that it uses when it stops a review. It uses the term rescission, or it gets to final results, obviously. In both cases, substantively what that means is that Commerce has made a decision about what the rates will be that will apply to the entries that were the subject of the review. Now, with this revocation notice, it obviously didn't decide on any rates, and also at the end of the notice it says, well, all of this remains suspended, so obviously there was unfinished business. So, the notice on its face tells you that, well, something will still need to be done in the future, because these reviews are there, but they haven't been decided, and we're holding the entries in abeyance until we do. So, the notice itself, to me, is clear, regardless of, you know, you don't even have to worry about whether the word rescission was used or not used, is it the word discontinue, or some other word, should they have used the word stay, well, who knows. But in its substance, it is clear, because there is things, there are things that are left undone in the notice. And so, then the remaining issue would then be, okay, when Commerce, in 2013, came up with a new notice that resumed the reviews, is there something wrong with that? And the argument that was offered by BMW was that the agency, that there was something wrong with that, because they seemed to make two arguments, or mainly two arguments. One of them was that the statutory deadlines had been exceeded, and of course, you know, for issuance of the preliminary results, which, you know, is true. But as the case law makes quite clear, these deadlines, if they are exceeded, that doesn't deprive Commerce from, you know, when it has a chance to do it, to fulfill its statutory obligations and do something different. So, yes, the deadline has been exceeded. The Camira case, which the government cited is obviously very appropriate, but it is, BMW argues while in Camira, the court talks about prejudice, you know, is there some prejudice to the party because of the delay, right? There's a crucial distinction in our case with Camira, right? Yes, there was a delay to BMW, but it was not the result of any action that Commerce took. It was the result of BMW's, I guess, misunderstanding of the first notice, and then its failure to act on the second notice, or not having seen the second notice, or whatever. So I think we're going to have to conclude. We have some final thought. We're way beyond our time. All right. Thank you, Your Honor. Thank you. Thank you. Your Honors, the government's argument is essentially that under the statute, it can use any rate it wishes if it's based on a primary source, and that simply cannot be the case. If that were the case, then the Department of Commerce could pick a rate of 500% or 1,000%, and there would be no check to ensure that the rate that's imposed is not punitive. There has to be some standard to ensure that a rate is not punitive, and we think that that standard is to ensure that the rate is warranted by the deterrence that's required under the particular facts of the particular case, and that's what Commerce did not do in its remand results of this case. In this case, in its remand results, the rate of 126% was applied. It was, for all intents and purposes, an arbitrary number. The Department of Commerce recited several reasons why it fell within a certain range and why it may not have been aberrational, but it didn't explain to us why that rate, why that level of deterrence, why did it have to impose a rate of more than double what BMW would have gotten had it simply not requested its own administrative review. And we're not saying that the court or the department is required to pick a certain number, but it is required to base its decision on the record of that case, find the rate that is most probative, ensure that it's not punitive, and determine what deterrence is required. In this case, there was no deterrent factor really required because this order had already gone away. There were going to be no future review periods. BMW was not going to be engaging in another review. And if the motive here was to use BMW as an example for other parties, then that's prima facie punitive. BMW being used as an example to make sure that other parties and other proceedings and other cases comply is punitive for BMW, and it's not tied to BMW's own actions on the record of this case. The legislative history and the statutory scheme require that Commerce look at the whole record and that its decision is based on substantial evidence. And I see that I'm going into... You've exceeded your time. I've exceeded my time. You have one final thought. And the final thought on revocation. We do feel that the statute is clear. No gap-filling is required. The order was revoked. The review was terminated. And 1675A says that a review must be conducted only if a request for the review has been received. And that's particularly the case in this situation where a gap of two and a half years had passed, and it was procedurally irregular. Thank you, Your Honor. Thank you. We thank both sides in the case.